Sandra POHL and Linda Dondore
and Paul Bare, Appellants

v.

NGK METALS CORPORATION and
Cabot Corporation, Appellees.

Superior Court of Pennsylvania.

Argued June 27, 2007.
Filed Oct. 11, 2007.
Reargument Denied Dec. 13, 2007.

Rueben Honik, Philadelphia, for appellants.

Neil S. Witkes, Bala Cynwyd, for Cabot, appellee.

Thomas C. DeLorenzo, Philadelphia, for NGK, appellee.

BEFORE: TODD, GANTMAN, and KELLY, JJ.

## OPINION BY GANTMAN, J.:

¶ 1 Appellants, Sandra Pohl, Linda Dondore, and Paul Bare, appeal from the order entered in the Philadelphia County Court of Common Pleas, granting summary judgment in favor of Appellees, NGK Metals Corporation and Cabot Corporation. Specifically, Appellants ask us to determine whether the trial court erred in granting Appellees' summary judgment motion after striking Appellants *praecipe* to discontinue their case. Appellants also challenge the court's finding that they cannot sustain a medical monitoring claim, because they failed to demonstrate they have a significantly increased risk of contracting Chronic Beryllium Disease ("CBD"), a latent disease. We hold the court properly struck Appellants' *praecipe* to discontinue their case. We further hold the court correctly entered summary judgment in favor of Appellees, because Appellants failed to establish they are at a significantly increased risk of contracting CBD, which is a required element of their cause of action for medical monitoring. Accordingly, we affirm.

¶ 2 The trial court opinion fully and correctly sets forth the relevant facts and procedural history of this case as follows:

Initially, [Appellants] Sandra Pohl ("Pohl"), Linda Dondore ("Dondore"), and Paul Bare ("Bare") sought to bring this action against [Appellees] NGK Metals Corporation ("NGK") and Cabot Corporation ("Cabot") as a class action, but the court denied the motion for class certification on June 30, 2003. This decision was affirmed by the Superior Court in *Pohl v. NGK Metals*, 863 A.2d 1239 (2004), *[appeal] denied*, 582 Pa. 718, 872 A.2d 1200 (2005). Thereafter, the three [Appellants] continued this action in their individual capacities. [Appellees] filed a motion for summary judgment in October 2004, but the court could not consider the motion until the *allocatur* petition was denied. Oral argument on the motion was held on July 11, 2005 and summary judgment was granted on December 23, 2005, but was

not filed until this opinion explaining the court's decision could be prepared.

[Appellants] seek medical monitoring for chronic beryllium disease ("CBD") as a result of their alleged exposure to beryllium emitted from [Appellees'] beryllium processing plant under both common law and Pennsylvania's Hazardous Sites Cleanup Act. None of [Appellants] worked at the plant, although all lived nearby and assert they were exposed to beryllium in the ambient air. Both Pohl, since 1974, and Dondore, since 1952, have continually resided within three-tenths of a mile of [Appellees'] plant. Bare lived two blocks from [Appellees'] plant between 1951 and 1967. The plant closed in 2000.

CBD is a granulomatous lung disorder that is believed to be an immunologic response to particles of beryllium in the lungs. CBD affects between one and three percent of those exposed to beryllium, because only those individuals with a specific immune response or allergy to beryllium can develop the disease. Thus, even those workers at [Appellees'] plant with enormous exposure to beryllium—which ranged from an astonishing high of 131.0 ug/m$^3$ until 1959 for plant workers to a low of 0.03 ug/m3 during the 1980s for secretaries—cannot develop the disease if they lack the immunologic response to beryllium.[2]

---

[2] The current government beryllium exposure standard for the ambient air is 0.01 ug/m$^3$ (micrograms per cubic meter of air). It appears the ambient air outside [Appellees'] plant has not exceeded the standard since 1989.

To measure beryllium sensitivity, a person must take the beryllium lymphocyte proliferation test ("BeLPT"), which was first performed by [Appellants'] expert, Milton Rossman, MD. Dr. Rossman noted that a positive result on the BeLPT merely detects beryllium sensitivity, which indicates the person was previously exposed to beryllium. According to another [Appellants'] expert, Lisa A. Maier, MD, those who have evidence of an allergic immune response to beryllium are considered beryllium sensitized. Beryllium sensitized individuals are asymptomatic, however, and do not have evidence of abnormal lung function or impairment, although a number of these individuals will develop CBD eventually.

* * *

[Appellants] have shown no beryllium sensitivity. Pohl has never taken the BeLPT. Dondore received the BeLPT in 1999 and the results were negative. Bare took the BeLPT in 2002 and the results were negative. Given the opportunity by the court to supplement the record, [Appellants] neither presented additional medical evidence nor presented evidence that exposure to beryllium without the allergic immune response puts one at risk for CBD.

(Trial Court Opinion, filed June 23, 2006, at 1–3).

¶ 3 In its supplemental Rule 1925(a) opinion, the court continued:

[On] June 23, 2006, [Appellants] filed with the Prothonotary a *Praecipe* to Discontinue the within action. [That same day, the order granting Appellees' summary judgment motion was entered on the docket]. [Appellants'] *Praecipe* to Discontinue, however, was not entered on the docket until June 27, 2006. Thus, at the time the court's order granting summary judgment was entered on the docket the court was unaware that [Appellants] had attempted to discontinue the action.

On July 17, 2006, [Appellants] filed a Motion to Vacate the December 23, 2005

order [granting summary judgment] or in the Alternative, for Reconsideration. [Appellants] contended that the action was deemed discontinued at the time the *Praecipe* to Discontinue was filed, therefore, the court's order and opinion granting summary judgment should be considered void.[2] [Appellees] opposed [Appellants] motion, asserting, *inter alia*, that [Appellants'] *Praecipe* to Discontinue was entered on the docket some four days **after** the grant of summary judgment[;] thus, there were no longer any claims to discontinue. However, should the court consider the discontinuance timely, it should nonetheless be stricken pursuant to Pa.R.C.P. 229(c), as it would result in prejudice and harassment to [Appellees].

---

[2] [Appellants'] *Praecipe* indicates by its stamp that it was presented to the Prothonotary for [r]eview June 23, 2006, at 11:15 a.m.; however, the docket entries show that it was not docketed by the Prothonotary until June 27, 2006. The docket entries further indicate that the court's order and opinion were docketed at 3:45 p.m. [on June 23, 2006].

On July 21, 2006, [Appellants] filed the within appeal. On August 2, 2006, after careful consideration of [Appellants'] Motion to Vacate, and [Appellees'] response thereto, the court denied the motion and contemporaneously ordered [Appellants] to file a Concise Statement of Matters Complained of on Appeal pursuant to Pa.R.A.P. 1925(b). [Appellants] filed their [Rule] 1925(b) statement on August 15, 2006....

(Supplemental Trial Court Opinion, filed December 1, 2006, at 1–2) (internal citation omitted) (emphasis in original).

¶ 4 On appeal, Appellants raise two issues for our review:

WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN ENTERING AN ORDER GRANTING SUMMARY JUDGMENT TO [APPELLEES] AFTER THIS CASE HAD BEEN PROPERLY DISCONTINUED BY *PRAECIPE?*
WHETHER THE TRIAL COURT ERRED BY IGNORING EVIDENCE THAT THESE [APPELLANTS] WERE, AND REMAIN, AT AN INCREASED RISK OF CONTRACTING A DISEASE SUCH THAT THE GRANT OF SUMMARY JUDGMENT WAS IMPROPER IN THESE MEDICAL MONITORING CLAIMS?

(Appellants' Brief at 4).

¶ 5 In their first issue, Appellants assert their *praecipe* to discontinue was docketed on June 23, 2006, at 11:15 a.m. Appellants contend the court's order and opinion granting Appellees' summary judgment motion was not entered until 3:45 p.m. that same day. Appellants insist their filing of the discontinuance ended this matter, and no further action could take place involving this case. Appellants conclude the court's order granting summary judgment was entered on the docket after the case had been properly discontinued, and the entry of the order following the discontinuance constitutes reversible error. We disagree.

¶ 6 Rule 229 provides, in relevant part, as follows:

### Rule 229. Discontinuance

(a) A discontinuance shall be the exclusive method of voluntary termination of an action, in whole or in part, by the plaintiff before commencement of the trial.

\* \* \*

(c) The court, upon petition and after notice, may strike off a discontinuance in order to protect the rights of any party from unreasonable inconvenience, vexation, harassment, expense, or prejudice.

Pa.R.C.P. 229(a), (c).

¶ 7 "A discontinuance in strict law must be by leave of court, but it is the

universal practice in Pennsylvania to assume such leave in the first instance." *Fancsali ex rel. Fancsali v. University Health Center of Pittsburgh*, 563 Pa. 439, 444, 761 A.2d 1159, 1161 (2000) (quoting *Consolidated National Bank v. McManus*, 217 Pa. 190, 191, 66 A. 250, 250 (1907)). *See also Gray v. Magee*, 864 A.2d 560 (Pa.Super.2004) (stating same). However, the discontinuance is subject to be stricken for cause shown:

> The causes which will move the court to withdraw its assumed leave and set aside the discontinuance are addressed to its discretion, and usually involve some unjust disadvantage to the defendant or some other interested party....

*Fancsali, supra* at 445, 761 A.2d at 1162 (quoting *Consolidated National Bank, supra* at 192, 66 A. at 250). "A discontinuance that is prejudicial to the rights of others should not be permitted to stand even if it was originally entered with the expressed consent of the court." *Foti v. Askinas*, 432 Pa.Super. 604, 639 A.2d 807, 808 (1994).

¶ 8 In determining whether to strike a discontinuance, "the trial court must consider all facts and weigh equities. Further, the trial court must consider the benefits or injuries which may result to the respective sides if a discontinuance is granted." *Id.* In *Foti*, the case had been pending for approximately five years at the time of the discontinuance. "Depositions had been taken, interrogatories exchanged and several motions ruled on by the court." *Id.* at 809. This Court ultimately held that the trial court had abused its discretion in granting the discontinuance where "appellants, who endured the burden of litigating the initial suit for almost five years, may again be subjected to the same litigation." *Id.*

¶ 9 Additionally, discontinuances may be improper where there is a dispositive motion pending. *Nichols v. Horn*, 363 Pa.Super. 301, 525 A.2d 1242 (1987). In *Nichols*, this Court concluded the trial court abused its discretion by refusing to strike a discontinuance where a motion for summary judgment was pending. This Court explained:

> We think prejudice has been shown where, as here, a motion for summary judgment has been filed and the party seeking to strike the discontinuance would be entitled to summary judgment if the discontinuance was not allowed. Under these circumstances, the court abused its discretion in refusing to find prejudice.

*Id.* at 1243.

¶ 10 Our courts have also held that discontinuances are improper where it is apparent that the purpose of plaintiffs' discontinuance is to "forum shop." *Brown v. T.W. Phillips Gas & Oil Co.*, 365 Pa. 155, 74 A.2d 105 (1950). In *Brown*, the plaintiffs sought to discontinue their case in an effort to pursue a similar action that had begun in federal court. The Court explained, "[O]nce the jurisdiction of a competent court has attached, discontinuance of the action ought not to be permitted over objection of the adversary if the only reason for discontinuing is the plaintiff's desire to institute action for the same cause in another forum." *Id.* at 159, 74 A.2d at 108. *See also Quattrone v. Quattrone*, 240 Pa.Super. 619, 361 A.2d 399 (1976) (explaining discontinuance is improper where it appears discontinuance was for purpose of instituting action elsewhere).

¶ 11 Instantly, Appellants presented their *praecipe* to discontinue the action on June 23, 2006. Court personnel marked the *praecipe* "Presented for Review," and the court did not expressly grant or deny the *praecipe* at that time.

Nevertheless, the *praecipe* was entered on the docket on June 27, 2006. Meanwhile, on June 23, 2006, the court granted Appellees' summary judgment motion. As the court noted, it "was unaware that [Appellants] had attempted to discontinue the action" at the time of the summary judgment order. (Supplemental Trial Court Opinion at 2). On these facts, we cannot agree with Appellants' conclusion that the filing of the *praecipe* to discontinue entirely resolved the issue.

¶ 12 Appellees subsequently challenged the discontinuance. Specifically, Appellees argued:

> [The c]ourt possesses more than ample factual justification to exercise its discretion to strike off a discontinuance pursuant to Rule 229(c): (i) the extent of litigation in the matter over six years and harassment to [Appellees] if the action is discontinued; (ii) the prejudice to [Appellees] if discontinuance were sustained, including depriving them of a hard-fought dispositive ruling, and (iii) [Appellants'] intention (whether transparent or inferred) to circumvent the [c]ourt's grant of summary judgment, merely to re-file the same claims against the [Appellees]in the Beryllium Program Docket. Any of these reasons would warrant striking the discontinuance. Collectively, they compel it.

(Appellees' Memorandum of Law in Opposition to Appellants' Motion to Vacate or, in the Alternative, for Reconsideration, filed 7/21/06, at 5–6). The court found Appellees' argument persuasive, noting "even if the court had not yet decided [Appellees'] motion for summary judgment, permitting the discontinuance at this stage in the litigation and in the face of

[Appellees'] opposition would have been an abuse of discretion." (Supplemental Trial Court Opinion at 4). We accept this conclusion. In light of the applicable standard of review and the relevant case law, the court properly struck Appellants' discontinuance. *See Foti, supra; Nichols, supra;* Pa.R.C.P. 229(c). As such, Appellants are not entitled to relief on their first claim.[1]

■ ¶ 13 In their second issue, Appellants assert they presented expert testimony indicating they have a significantly increased risk of contracting CBD. Specifically, Appellants maintain that Dr. Martyny, a beryllium industrial hygiene expert, opined within a reasonable degree of scientific certainty that Appellants were at a substantially increased risk of contracting CBD. Appellants insist the affidavit and testimony from another expert, Dr. Maier, echoed the opinion of Dr. Martyny. Appellants further emphasize Dr. Maier's recommendation for a medical monitoring program to evaluate the beryllium related health effects.

¶ 14 Appellants avow the sole ground for summary judgment was that only "sensitized" individuals are at risk, a concept directly refuted by Appellants' experts. Appellants contend Dr. Maier's testimony suggested that someone exposed to beryllium can be "susceptible" without being found sensitive, and susceptible individuals are also at risk. Appellants aver their experts' opinions indicate Appellants are susceptible to an adverse beryllium health effect, regardless of whether they register sensitivity. Appellants conclude this evidence presents a genuine issue of material fact, and the court erroneously granted summary judgment in favor of Appellees.

---

1. Appellants emphasize their purpose for discontinuance was to join a similar class action beginning in federal court. (Appellant's Brief at 7). Allowing Appellants' discontinuance to stand would encourage "forum-shopping," whereby Appellees would be made to litigate the same action again in a different court. *See Brown, supra; Quattrone, supra.*

¶ 15 In response, Appellees assert Appellants must prove they face a **significantly** increased risk of contracting CBD to establish a claim for medical monitoring. Appellees argue Appellants failed to meet this burden, because only those individuals who exhibit sensitivity to beryllium are at a significantly increased risk of contracting CBD, and only a subset of sensitized individuals actually do contract the disease. Appellees aver Appellants' experts agree that a BeLPT will indicate whether one is sensitized to beryllium. Appellees insist, absent positive results from the BeLPT, Appellants lack evidence they are sensitized; thus, Appellants cannot show they face a significantly increased risk of contracting CBD. Appellees suggest this lack of proof led the trial court to deny class certification, and "just as [Appellants] lacked membership in the medical monitoring class they sought to represent, they similarly lack evidence to establish a medical monitoring claim." (Appellees' Brief at 12). Appellees conclude the trial court properly granted summary judgment in favor of Appellees. We agree.

¶ 16 "Motions for summary judgment necessarily and directly implicate the plaintiff[s'] proof of the elements of [their] cause of action." *Lineberger v. Wyeth,* 894 A.2d 141, 146 (Pa.Super.2006).

> Summary judgment is proper if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury. Thus, a record that supports summary judgment will either (1) show the material facts are undisputed or (2) contain insufficient evidence of facts to make out a *prima facie* cause of action or defense and, therefore, there is no issue to be submitted to the jury. Upon appellate review, we are not bound by the trial court's conclusions of law, but may reach our own conclusions. The appellate Court may disturb the trial court's order only upon an error of law or an abuse of discretion.

> Judicial discretion requires action in conformity with law on facts and circumstances before the trial court after hearing and consideration. Consequently, the court abuses its discretion if, in resolving the issue for decision, it misapplies the law or exercises its discretion in a manner lacking reason.

Where the discretion exercised by the trial court is challenged on appeal, the party bringing the challenge bears a heavy burden.

> [I]t is not sufficient to persuade the appellate court that it might have reached a different conclusion if ... charged with the duty imposed on the court below; it is necessary to go further and show an abuse of the discretionary power. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused.

*Id.* at 146 (internal citations and quotation marks omitted).

¶ 17 In Pennsylvania, a plaintiff must prove each of the following factors to sustain a medical monitoring claim:

(1) exposure greater than normal background levels;

(2) to a proven hazardous substance;

(3) caused by the defendant's negligence;

(4) as a proximate result of the exposure, plaintiff has a **significantly in-**

creased **risk** of contracting a serious latent disease;

(5) a monitoring procedure exists that makes early detection of the disease possible;

(6) the prescribed monitoring regime is different from that normally recommended in the absence of the exposure; and

(7) the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

*Redland Soccer v. Department of the Army,* 548 Pa. 178, 195–96, 696 A.2d 137, 145–46 (1997) (emphasis added). Proof of these elements requires expert testimony. *Id.* at 196, 696 A.2d at 146.

¶ 18 Instantly, Appellants presented expert testimony regarding whether Appellants face a significantly increased risk of contracting CBD. Dr. Maier testified that CBD results from a body's immunologic response to beryllium exposure. (N.T. Class Certification Hearing, 1/23/02, at 97; R.R. at 903a). This immunologic response is similar to an allergy, in that only those individuals genetically predisposed to this reaction may contract beryllium sensitivity upon exposure. (*Id.* at 97–98; R.R. at 903a–904a). Additionally, Appellants' expert, Dr. Maier, testified that beryllium sensitization is a **necessary precursor** to developing CBD:

> [DEFENSE COUNSEL]: And you contend, I think in your affidavits and certainly in your published materials, that [CBD] is in all cases preceded by this immunologic response.
>
> [WITNESS]: That is what we have learned looking at the natural history of beryllium sensitization; yes.
>
> [DEFENSE COUNSEL]: And that is what your current view is, that berylli-

um sensitization is a necessary precursor to [CBD]?

> [WITNESS]: It develops with it or before it is the current medical understanding.
>
> [DEFENSE COUNSEL]: But that's the progression of the disease, that the body would recognize the beryllium as a foreign body, it's attacked by the body's defense mechanism, and treats it as a foreign body so you will get sensitization that may or may not lead to [CBD]?
>
> [WITNESS]: That is correct.
>
> [DEFENSE COUNSEL]: But you need sensitization, assuming accuracy of a test, in order to get [CBD]?
>
> [WITNESS]: Yes. Some people, when we have diagnosed them with sensitization, already have [CBD] but it is assumed that that preceded, sensitization preceded.

\* \* \*

> [DEFENSE COUNSEL]: [I]f you are not sensitized, then you're not going to get [CBD]?
>
> [WITNESS]: If you're not sensitized now or don't become sensitized in the future.
>
> [DEFENSE COUNSEL]: You will not get [CBD].
>
> [WITNESS]: Correct.

(*Id.* at 103–05; R.R. at 909a–911a). Dr. Maier testified that a negative BeLPT does not preclude the possibility that an individual is beryllium sensitized.[2] Dr. Maier also explained that a small percentage of individuals who do not demonstrate beryllium sensitivity on their BeLPT may be a result of a false negative reading. (*Id.* at 106; R.R. at 912a).

¶ 19 Appellants' next expert, Dr. Martyny, testified he could not determine

---

**2.** Both Appellants' and Appellees' experts agreed that a BeLPT can detect beryllium sensitization.

whether Appellants were at a significantly increased risk of contracting CBD. Although Dr. Martyny indicated that exposure to beryllium at background levels above normal does create a risk, he could not determine whether the risk is significant. (*Id.* at 167; R.R. Volume 2 at 973a).

¶ 20 Appellants' third expert, Dr. Rossman, testified to the number of individuals exposed to beryllium who may later contract CBD. Dr. Rossman indicated that between one and three percent of an exposed population might become beryllium sensitized. (N.T. Class Certification Hearing, 9/19/02, at 51–52; R.R. Volume 3 at 1404a–05a). Dr. Rossman also explained that approximately one-half of the individuals who become beryllium sensitized might contract CBD. (*Id.* at 52; R.R. Volume 3 at 1405a). Of those individuals who might contract CBD, approximately one-half might actually require treatment. (*Id.*)

¶ 21 Appellees' also presented expert witnesses at the class certification hearing. Appellees' expert Dr. Harbison testified that a diagnosis of CBD requires an abnormal BeLPT. (N.T. Class Certification Hearing, 1/24/02, at 70; R.R. at 1146a). Additionally, both Dr. Harbison and Appellees' second expert, Dr. Sandler, agreed there is no methodology to support the claim that Appellants, as well as the other members of their class action suit, were at a significantly increased risk of contracting CBD.

¶ 22 Throughout the class certification hearings, both Appellants' and Appellees' experts discussed the difference between beryllium susceptibility and beryllium sensitivity. Approximately thirty-five to forty percent of the general population has some type of beryllium susceptibility. (N.T. Class Certification Hearing, 1/23/02, at 64; R.R. Volume 2 at 870a). However, Dr. Maier indicated the concept of beryllium

susceptibility is only a hypothesis. (*Id.* at 98; R.R. Volume 2 at 904a). Dr. Maier also testified that there is currently no test available to determine whether an individual is "susceptible" to an adverse beryllium health effect. Dr. Maier admitted she could not positively determine whether Appellants were susceptible to beryllium. (*Id.* at 102–03; R.R. Volume 2 at 908a–09a). Another of Appellants' experts, Dr. Sandler, echoed this viewpoint. Dr. Sandler testified that he was unaware of any test available to determine which individuals are susceptible to adverse beryllium health effects. (N.T. Class Certification Hearing, 1/30/02, at 100–02; R.R. Volume 3 at 1324a–25a).

¶ 23 This record provides no support for Appellants' contention that they are sensitive to beryllium or face a significantly increased risk of contracting CBD. Additionally, Appellants cannot show they are even susceptible to beryllium, because beryllium susceptibility cannot be determined by a test. Even if a test were available to prove Appellants are susceptible to beryllium, no expert testimony supports Appellants' claim that susceptibility, absent beryllium sensitivity, creates a significantly increased risk of contracting CBD. At the time of the class certification hearings, Appellants Dondore and Bare had tested negative for beryllium sensitivity. Appellant Pohl still has not even been tested.

¶ 24 At the July 11, 2005 hearing on Appellees' summary judgment motion, the court offered Appellants the opportunity to undergo additional BeLPT testing to supplement the record. Appellants, however, refused the offer. (N.T. Hearing, 7/11/05, at 92–93; R.R. Volume 1 at 478a–79a). In light of the expert testimony, as well as Appellants' failure to demonstrate beryllium sensitivity through positive BeLPT results, Appellants cannot show they face a significantly increased risk of developing

CBD.[3] *See Redland, supra.* As such, Appellants failed to produce evidence of facts essential to their cause of action for medical monitoring. *See Lineberger, supra.* Thus, the record in this case supports summary judgment, because it contains insufficient evidence to make out a *prima facie* cause of action, and there is no issue to be submitted to the jury. *See id.*

¶ 25 Based upon the foregoing, we hold the court properly struck Appellants' *praecipe* to discontinue their case. We also hold Appellants failed to establish that they are at a significantly increased risk of contracting CBD, which is a required element of their cause of action for medical monitoring. Accordingly, we affirm the court's order granting summary judgment in favor of Appellees.

¶ 26 Order affirmed.

**3.** Importantly, we also agree with the trial court's determination that Appellants are free to bring another action for medical monitoring if and when they have a positive BeLPT or develop CBD. (Trial Court Opinion at 4).