Randall HARRIS, as Administrator of
the Estate of Leonard P. Harris, De-
ceased and Louise Harris, Appellant

v.

NGK NORTH AMERICAN, INC. and
NGK Insulators, Ltd. and NGK Metals
Corporation and Yasuhito Niwa and
Len Velky, and Cabot Corporation, In-
dividually and as Successor in Interest
to Cabot Berylco, Inc., Kawecki Beryl-
co, Inc., a/k/a KBI Kawecki Berylco
Industries, Inc. and the Beryllium
Corporation and Spotts, Stevens &
McCoy, Inc., Appellees.

Randall Harris, as Administrator of
the Estate of Leonard P. Harris,
Deceased and Louise Harris,

v.

NGK North American, Inc. and NGK
Insulators, Ltd. and NGK Metals Cor-
poration and Yasuhito Niwa and Len
Velky, and Cabot Corporation, Indi-
vidually and as Successor in Interest
to Cabot Berylco, Inc., Kawecki Beryl-
co, Inc., a/k/a KBI Kawecki Berylco
Industries, Inc. and the Beryllium
Corporation and Spotts, Stevens &
McCoy, Inc.

Appeal of NGK Insulators, Ltd.

Superior Court of Pennsylvania.

Argued July 28, 2010.
Filed March 30, 2011.
Reargument Denied June 9, 2011.

Ruben Honik, Philadelphia, for Harris.

Neil S. Witkes, Bala Cynwyd, for Cabot Corporation.

\* Former Justice specially assigned to the Superior Court.

1. Appellants' claims were dismissed in three orders. In an order dated September 29, 2008, the trial court dismissed the Estate's claims and Mrs. Harris' loss of consortium claim. In a separate order, also dated September 29, 2008, the trial court dismissed Appellants' negligence claim against Stevens, Spotts & McCoy, Inc. In an order docketed January 18, 2008, the trial court dismissed Mrs. Harris' medical monitoring claim.

2. Appellants' expert witness, John W. Martyny, described beryllium as follows:

Beryllium is a silver-gray metal known for its lightness, stiffness, corrosion-resistance, and ability to disperse heat rapidly. In addition, when alloyed with other metals (e.g. copper or aluminum) it tends to pass on these qualities to the primary metals. For these reasons, it is widely used both as an alloy and as a pure metal in a variety of

James C. Stroud, Philadelphia, for NGK Insulators.

Thomas C. DeLorenzo, Philadelphia, for NGK Metals.

Stephen J. Imbriglia, Philadelphia, for Spotts.

BEFORE: MUSMANNO, FREEDBERG, and FITZGERALD \*, JJ.

OPINION BY FREEDBERG, J.:

This matter is before the Court on the appeal of Randall Harris, as the administrator of the estate of Leonard P. Harris ("Estate") and Louise Harris, widow of Leonard Harris, from orders entered by the Court of Common Pleas of Philadelphia County, granting summary judgment in favor of all Appellees.[1] Appellee NGK Insulators, Inc. ("Insulators") has also filed a cross-appeal relating to service and personal jurisdiction. We reverse in part and affirm in part.

The instant matter arises in relation to a beryllium[2] plant operated by Appellees in Reading, Pennsylvania ("Reading plant").[3]

high technology and aerospace applications. Beryllium also has a strategic importance in that it is a source of both low and high-energy neutrons when bombarded by other nuclear radiation and is therefore utilized in the manufacture of nuclear weapons.
Expert Witness Report by John W. Martyny, at 1.

3. The plant opened in 1935 under the name Pennsylvania Malleable Iron Company. It was purchased that same year by the Beryllium Corporation. Over the next fifty years, the plant was owned by Kawecki Chemical Berylco Industries and Cabot Corporation. In 1986, the Reading plant was purchased by NGK Metals Corporation, which operated the plant until it was closed in 2000. NGK Metals Corporation is a wholly-owned subsidiary of NGK North America, Inc., which is a wholly-owned subsidiary of NGK Insulators, Ltd. Appellee Stevens, Spotts, & McCoy Inc. ("SSM") is an engineering firm retained by

Leonard Harris worked at the Reading plant for one year, and lived within six miles of the plant for approximately sixty-six years. Mr. and Mrs. Harris filed suit, alleging his diagnosis with chronic beryllium disease ("CBD") was caused by occupational and residential exposure to beryllium. After Leonard Harris died, a second amended complaint was filed, substituting Randall Harris as administrator of the estate and adding wrongful death and survival claims.

CBD is a granulomatous lung disorder, which is caused by an immunologic response to beryllium in the lungs. Only individuals who have been exposed to beryllium and have a specific immune response to it, similar to an allergy, can develop CBD. *See Pohl v. NGK Metals Corp.*, 936 A.2d 43, 45 (Pa.Super.2007), *petition for allowance of appeal denied,* 597 Pa. 733, 952 A.2d 678 (2008); Declaration of Craig S. Glazer, MD, MSPH, at 2–3. Mrs. Harris, who has not been diagnosed with CBD, bases her claims on her take-home[4] and residential exposure to beryllium and seeks medical monitoring in addition to loss of consortium damages.

Appellants raise four issues on appeal:

A. Whether the Trial Court erred in granting the Defendants' Motion for Summary Judgment as to [t]he Estate [of] Leonard Harris because of a fundamental misunderstanding about the nature of Mr. Harris' diagnosis and its implications for its disability consequences and physical impairment?

B. Whether the Trial Court correctly permitted Plaintiffs to serve NGK Insu-

lators, Ltd. pursuant to Pennsylvania Rule of Civil Procedure 405.

C. Whether the Trial Court erred in granting the Defendants' motion for Summary Judgment as to Louise Harris' medical monitoring claims in the face of material questions of fact?

D. Whether the Trial Court erred in granting Spotts, Stevens, & McCoy, Inc.'s Motion for Summary Judgment in the face of material questions of fact?

Brief for the Appellants, at 3.

As to the third question presented, relating to Mrs. Harris' medical monitoring claim, we follow *Pohl v. NGK Metals Corp.*, 936 A.2d 43 (Pa.Super.2007), *appeal denied,* 597 Pa. 733, 952 A.2d 678 (2008), to affirm the trial court's grant of summary judgment.

Appellants' fourth question relates to alleged negligence of Stevens, Spotts, & McCoy, an engineering company. Appellants' have adopted the argument set forth in the companion case of *Reeser v. NGK North American, Inc.,* and we adopt the reasoning set forth in *Reeser v. NGK North American, Inc.,* 14 A.3d 896 (Pa.Super.2011)[5], in affirming the trial court's grant of summary judgment.

Appellant's second question on appeal addresses the issues raised in the cross-appeal[6], in which Insulators asserts that the trial court improperly overruled its preliminary objections relating to service and personal jurisdiction. Insulators contends that it was not properly served and that the trial court lacks jurisdiction.

the owners of the Reading Plant to conduct "stack testing," which included measuring the amount of beryllium particulate in the air.

**4.** "Take-home" exposure refers to exposure to beryllium particles that were carried into homes on the clothing of spouses who were employed at the Reading plant.

**5.** *Reeser* is currently available at: 2011 PA Super 17, 14 A.3d 896 (Pa.Super.2011).

**6.** Appellants adopted the argument set forth in the companion case of *Bailey v. NGK North America, Inc.*

The appropriate standard of review was set forth in *De Lage Landen Fin. Servs., Inc. v. Urban P'ship, LLC*, 903 A.2d 586 (Pa.Super.2006), as follows:

> Our standard of review of an order of the trial court overruling ... preliminary objections, is to determine whether the trial court committed an error of law. When considering the appropriateness of a ruling on preliminary objections, the appellate court must apply the same standard as the trial court. Those substantive legal standards are as follows:
>
>> When preliminary objections, if sustained, would result in the dismissal of an action, such objections should be sustained only in cases which are clear and free from doubt. Moreover, when deciding a motion to dismiss for lack of personal jurisdiction the court must consider the evidence in the light most favorable to the non-moving party.

*Id.* at 589 (internal citations and quotations omitted).

The trial court summarized the factual history of Appellants' attempts to serve Insulators as follows:

> The [Appellants] twice attempted to serve NGK Insulators in 2003. On July 15, 2003, Ruben Honik, [Appellants'] counsel, sent a letter via registered mail to NGK Insulator's [sic] headquarters in Nagoya, Japan. The letter was returned as having been "refused." A second letter sent by first-class mail on August 1, 2003, was also returned as "refused." On October 10, 2003, [Appellants] filed a petition for alternative service. On October 24, 2003, this Court, pursuant to Pennsylvania Rule of Civil Procedure 430, granted the [Appellants'] petition for alternative service and ruled that the [Appellants] may serve the NGK Insulators by mailing a copy of the civil action to NGK North America and Yasuhito Niwa, NGK North America's vice president.

*Moatz v. NGK Insulators, Ltd.*, 2008 WL 4690141, 2008 Phila. Ct. Com. Pl. LEXIS 236, *2–*3 (2008) (footnotes omitted).[7] Appellants completed service by the alternative method on November 5, 2003. Insulators then filed preliminary objections, asserting that service was not proper and that the trial court lacked jurisdiction. The preliminary objections were overruled on August 13, 2004.

Insulators argues that the attempted service by registered mail violates "The Convention on the Service Abroad of Judicial and Extra Judicial Documents in Civil or Commercial Matters," commonly referred to as the Hague Convention.[8] Insulators contends that allowing service in such a manner gives broader rights to Pennsylvania citizens suing a Japanese entity than Japanese citizens enjoy domestically and that its rights were not respected because the complaint was not translated into Japanese.

Article 10 of the Hague Convention provides:

> Provided the state of designation does not object, the present Convention shall not interfere with—
>
> (a) the freedom to send judicial documents, by postal channels, directly to persons abroad,

---

7. The case of Samuel and Ruth Moatz is a companion case to the instant matter.

8. "... [A]s a treaty ratified by the United States, the Hague Convention takes precedence over any conflicting state statute. United ed States Constitution, Art. VI cl. 2; *United States v. Pink*, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942)." *Sandoval v. Honda Motor Co., Ltd.*, 364 Pa.Super. 136, 527 A.2d 564, 566 (1987).

(b) the freedom of judicial officers, officials or other competent persons of the State of origin to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination,

(c) the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials, or other competent persons of the State of destination.

Japan has objected to subsections (b) and (c); it has not lodged any objections to subsection (a). At a 2003 Special Commission, Japan "clarified" its position on subsection (a), as follows:

Japan has not declared that it objects to the sending of judicial documents, by postal channels, directly to the addressees in Japan. As the representative of Japan made clear at the Special Commission of April 1989 on the practical operation of the Service and Evidence Conventions, Japan does not consider that the use of postal channels for sending judicial documents to persons in Japan constitutes an infringement of its sovereign power.

Nevertheless, as the representative also indicated, the absence of a formal objection does not imply that the sending of judicial documents by postal channels to addresses in Japan is always considered valid service in Japan. In fact, sending documents by such a method would not be deemed valid service in Japan in circumstances where the rights of the addressee were not respected.

"Conclusions and Recommendations Adopted by the Special Commission on the Practical Operation of the Hague Apostille, Evidence and Service Conventions," ¶ 57 (Oct. 28–Nov.4, 2003).

The instant dispute turns on what "send" in subsection (a) means. This issue has been raised in numerous courts, and there are two opposing views on the correct interpretation. One perspective, advanced by Insulators, is that the term "send" is used in subsection (a) in direct contrast to the term "service" used in subsections (b) and (c) because it applies only to the mailing of subsequent documents, after service has been properly effectuated through other means. *See, e.g., Nuovo Pignone v. Storman Asia M/V*, 310 F.3d 374 (5th Cir.2002); *Bankston v. Toyota Motor Corp.*, 889 F.2d 172 (8th Cir.1989); *Cupp v. Alberto–Culver USA Inc.*, 308 F.Supp.2d 873 (D.Tenn.2004); *ARCO Elec. Control Ltd. v. CORE Int'l*, 794 F.Supp. 1144 (S.D.Fl.1992). The alternative position, advanced by Appellants, is that the term "send" is equivalent to "service," and, because Japan has not objected to this subsection, service by mail on a foreign party is permitted. *See, e.g., Ackermann v. Levine*, 788 F.2d 830 (2d Cir.1986); *Brockmeyer v. May*, 383 F.3d 798 (9th Cir.2004); *Eli Lilly & Co. v. Roussel Corp.*, 23 F.Supp.2d 460 (D.N.J.1998); *Mitchell v. Theriault*, 516 F.Supp.2d 450 (M.D.Pa.2007); *The Knit With v. Knitting Fever, Inc.*, 2010 WL 2788203, 2010 U.S. Dist. LEXIS 70412 (E.D.Pa.2010).

■ This issue has not been addressed by the Pennsylvania Supreme Court. However, it has been analyzed once by this Court. In *Sandoval v. Honda Motor Co., Ltd.*, 364 Pa.Super. 136, 527 A.2d 564 (1987), the plaintiff sent a copy of a complaint written in English by registered mail to the defendant's headquarters in Japan. *Id.* at 565. The defendant objected, claiming that service by registered mail and without translation into Japanese violated the Hague Convention. *Id.* at 565–566. Adopting the interpretation that

"send" is equivalent to "service," this Court stated:

> It has been argued that Article 10(a) does not apply to the "service" of judicial documents because it uses the term, "send" instead of the word, "service". However, it has been documented that the drafters meant "service" and the discrepancy resulted from careless drafting. Ristau, *[Practical] Handbook [on the Operation of the Hague Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters* (1984) ], at 165–67; *Shoei Kako [v. Superior Court,* 33 Cal.App.3d 808, 821–22, 109 Cal.Rptr. 402, 411–12 (1973) ]. As the *Shoei Kako* court stated:

> > The reference to the freedom to [ ]send judicial documents by postal channels, directly to persons abroad would be superfluous unless it was related to the sending of such documents for the purpose of service.

> > That is so because the mails are open to everyone. Persons do not need an international convention on the service of judicial documents to give them the right to "send" mail.

*Sandoval,* 527 A.2d at 566. Thus, this Court found that sending the complaint by registered mail was sufficient to effectuate valid service.

As to whether there was a requirement of translating the document into Japanese, the *Sandoval* Court found that translation was not a necessity when service was effectuated under Article 10(a). *Id.* at 567. The plaintiffs in *Sandoval,* and Insulators in the instant matter, base their assertion that translation is required on Article 5 of the Hague Convention, which states:

> The Central Authority of the State addressed shall itself serve the document or shall arrange to have it served by an appropriate agency, either—

> *a)* by a method prescribed by its internal law for the service of documents in domestic actions upon persons who are within its territory, or

> *b)* by a particular method requested by the applicant, unless such a method is incompatible with the law of the State addressed.

> . . . .

> If the document is to be served under the first paragraph above, the Central Authority may require the document to be written in, or translated into, the official language or one of the official languages of the State addressed.

> . . . .

The *Sandoval* Court found that while Article 5 may require translation, the plaintiff had instead proceeded under Article 10(a), which does not contain a requirement of translation. Thus, this Court found that the plaintiff did not violate the defendant's rights by sending a complaint written in English through the mail.

In *Jordan v. Septa,* 708 A.2d 150 (Pa. Commw.1998), the plaintiff sent a writ of summons and complaint, written in English, by certified mail to a Japanese defendant. *Id.* at 151. The defendant filed preliminary objections, claiming that service was not proper because the documents were not translated into Japanese or served on the central authority established by the Hague Convention. *Id.* As Insulators does in the instant matter, the defendants in *Jordan* argued that *Sandoval* was incorrect and should not be followed. However, the Commonwealth Court found:

> We do not, however, find this reasoning [opposing the *Sandoval* interpretation] more persuasive than that articulated by the Superior Court in *Sandoval* and those courts in accord with *Sandoval.* First, there is nothing illogical for

a treaty to provide for alternative methods of service, and Article 10 does so provide by its plain language. It is therefore not illogical for the Hague Convention to provide for direct service mail when it has also developed a process for service upon a designated Central Authority. *See, e.g.,* Section 5323 of Pennsylvania's long-arm statute, 42 Pa. C.S. § 5323, which provides for service upon persons outside of the Commonwealth by a number of methods, including service by "any form of mail addressed to the person to be served and requiring a signed receipt." 42 Pa.C.S. § 5323(a)(3).

Second, we note that much of [the defendant's] argument, as well as that of the cases it cites for support, focuses upon Japan's "intent" in not objecting to Article 10(a), thus bringing the argument beyond the language of the Hague Convention itself. This argument assumes that Japan intended that service from abroad upon its citizens could only be by the most "restrictive" or "formal" means possible under the Convention. We have no basis to leap to this conclusion, or to discount the possibility that Japan may have had reasons of its own for not objecting to Article 10(a) and permitting service by mail. Further, [the defendant] has advanced no argument that would seriously support our discounting the Superior Court's documentation that the drafters of the Hague Convention intended Article 10(a) to include service by mail in favor of a presumed Japanese "intent" or understanding that Article 10(a) did not refer to service of judicial documents.

Accordingly, we adopt the reasoning that we find persuasive: the reasoning articulated by our Superior Court in *Sandoval.*

*Id.* at 153.

The *Sandoval* holding and reasoning controls our disposition. Appellants' attempts to serve Insulators under Article 10(a) did not violate the Hague Convention. Further, because Appellants were utilizing Article 10 to effectuate service, rather than Article 5, there was no translation requirement.

 Pa.R.C.P. 430 states:

**Service Pursuant to Special Order of Court. Publication.**

> (a) If service cannot be made under the applicable rule the plaintiff may move the court for a special order directing the method of service. The motion shall be accompanied by an affidavit stating the nature and extent of the investigation which has been made to determine the whereabouts of the defendant and the reasons why service cannot be made.

Because Appellants tried twice to effectuate service in an authorized manner, but were unable to do so because Insulators refused to accept the mail, it was within the trial court's discretion to enter an order establishing an alternative method for service.[9] Thus, Insulators was properly served.

Insulators also contends that the trial court does not have personal jurisdiction over it. Insulators asserts there is no basis for specific or general jurisdiction.[10]

---

9. Insulators does not contest the alternative method of service. Its briefs focus on whether the initial attempts at service violated the Hague Convention.

10. Insulators also argues that the trial court did not have personal jurisdiction because service was improper. We have already determined that the service was proper.

In *Kubik v. Letteri,* 532 Pa. 10, 614 A.2d 1110 (1992), the Pennsylvania Supreme Court discussed personal jurisdiction as follows:

> The Due Process Clause of the Fourteenth Amendment to the United States Constitution protects an individual's liberty interest by not allowing him to be subject to the jurisdiction of a foreign forum with which he has no established contact, ties or relations. *Burger King* [*Corporation v. Rudzewicz,* 471 U.S. 462, 471–472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)]. In order for a state to assert in personam jurisdiction over a non-resident defendant, due process requires the defendant to have certain *"minimum contacts* for [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95, 102 (1945) (emphasis added).

> A state may exercise in personam jurisdiction over a non-resident defendant based either upon the specific acts of the defendant which gave rise to the cause of action or upon the defendant's general activity within the state. When a state exercises personal jurisdiction over a non-resident defendant in a suit arising out of or related to the defendant's contacts with the forum, the state is exercising specific jurisdiction. *Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 1872 n. 8, 80 L.Ed.2d 404, 411 n. 8 (1984). In Pennsylvania, specific jurisdiction may be asserted over non-resident defendants "to the fullest extent allowed under the Constitution of the United States and may be based on the most *minimum contacts* with this Commonwealth allowed under the Constitu-

tion of the United States." 42 Pa.C.S. § 5322(b) (emphasis added).

*Kubik,* 614 A.2d at 1113–1114.

■ To assert specific jurisdiction over a non-resident, the non-resident must have sufficient minimum contacts with the forum state, and the assertion of jurisdiction must comport with fair play and substantial justice. *Id. citing Burger King,* 471 U.S. at 485–486, 105 S.Ct. 2174. To determine whether sufficient minimum contacts exist, the court must determine whether the non-resident's connection with the forum state is of such a degree that he could reasonably anticipate being haled into court in the forum state. *Id.*

Insulators asserts there is no general jurisdiction over it because it is incorporated and has its principal place of business in Japan; it has no officers in Pennsylvania; it has never contracted to supply goods or services in Pennsylvania; it has no officers or registered agents in Pennsylvania; and it has never purposefully availed itself of the privileges and immunities of conducting business in Pennsylvania. Brief for the Appellee/Cross–Appellant, at 19. While Appellants do not concede that general jurisdiction does not exist, they argue that specific jurisdiction exists in the instant matter because Insulators is being sued for specific acts which occurred in Pennsylvania.

■ Appellants assert that Insulators was ultimately responsible for plant safety, industrial hygiene controls, and capital investments because it set the policy the Reading plant was required to follow. Appellants rely on the deposition testimony in another matter, *Vitalo v. Cabot Corp., et al.,* of Yasuhito Niwa, the president of NGK Metals and vice-president of NGK North America. Niwa stated that Insulators decided issues such as major capital spending, top executive change, and global business planning. Deposition of Yasuhito

(Josh) Niwa, 1/22/2003, at 50.[11] He stated that, in these matters, NGK Metals would wait for a decision from Insulators rather than proceed on its own. Additionally, Niwa stated that the policies relating to obtaining approval from Insulators were contained in Insulators' corporate documents, which were written in Japanese with no translation available. *Id.* at 53–54. Appellants also point to a 1993 EPA report, in which the EPA found, and Niwa later confirmed, that Insulators supplied all beryllium-containing alloys used at the plant. At a deposition in a second matter, *Dondore v. NGK Metals Corp.*, Niwa testified that from 1992 through the Reading plant's closing in 2000, Insulators supplied NGK Metals with "thick gauge coils" and "billets," both of which contained beryllium.[12] Niwa testified that once the products were received from Japan, they were processed in the Reading plant using techniques that created dust and fumes.

Insulators first points out that the deposition testimony Appellants rely on was gathered in preparation for other litigation, in which Insulators was not sued and did not participate. Insulators contends that, given the chance to clarify his statements in a later affidavit, Niwa confirmed that the answers given at the first deposition were merely hypothetical—that is, Niwa never testified that Insulators actually discussed, approved, or rejected any capital investments or large scale improvements related to hygiene at the Reading plant. Affidavit of Yasuhito Niwa, 3/3/2004. Further, Insulators did not set policy as to hygiene or emissions controls; rather NGK Metals, which actually operated the plant, was responsible for these controls. *Id.* Niwa stated that only twice during the period that NGK Metals operated the Reading plant did it seek and receive approval from Insulators for capital expenditures—once for the creation of a product line in a new building and once to close the Reading plant and relocate to Tennessee. *Id.* He noted that NGK Metals did upgrade the waste water treatment plant at the Reading plant, at a cost of $700,000, without requesting approval from Insulators. *Id.* As to the EPA report Appellants cite, Insulators does not deny that it may have placed beryllium-containing alloys in the stream of commerce; however, it contends that Appellants failed to prove that the transactions took place in Pennsylvania rather than Japan. Brief for the Appellee/Cross–Appellant, at 22.

Based on the evidence that Insulators controlled decision-making on major capital expenditures and the testimony that Insulators supplied the Reading Plant with beryllium-containing products, Insulators had sufficient minimum contacts with the forum, so that the trial court was correct in exercising jurisdiction over it. *See, e.g., General Motors Acceptance Corp. v. Keller*, 737 A.2d 279, 282 (Pa.Super.1999) (finding jurisdiction where appellee, though he had no physical contact with or presence in Pennsylvania, knew or should have known he was dealing with a Pennsylvania corporation when he completed a credit application that was to be reviewed in Pennsylvania and sent the subsequent loan payments to a Pennsylvania office); *Taylor v. Fedra Int'l, Ltd.*, 828 A.2d 378, 382 (Pa.Super.2003) (finding several bases for jurisdiction, including shipping merchandise into Pennsylvania).

---

**11.** This deposition was attached as Exhibit C to Insulators preliminary objections to Appellants' complaint, filed June 24, 2003.

**12.** This deposition was attached to a letter, written March 12, 2004, to the trial judge from Appellants' attorney and was served on all parties. It is located at pages RR03572a–RR03579a in the reproduced record.

The remaining issue for our review is whether the trial court erred in granting summary judgment in favor of Appellees on the Estate's claims. When reviewing a grant of summary judgment, the appropriate scope and standard of review are as follows:

In reviewing an order granting summary judgment, our scope of review is plenary, and our standard of review is the same as that applied by the trial court. Our Supreme Court has stated the applicable standard of review as follows: [A]n appellate court may reverse the entry of a summary judgment only where it finds that the lower court erred in concluding that the matter presented no genuine issue as to any material fact and that it is clear that the moving party was entitled to a judgment as a matter of law. In making this assessment, we view the record in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. As our inquiry involves solely questions of law, our review is de novo.

Thus, our responsibility as an appellate court is to determine whether the record either establishes that the material facts are undisputed or contains insufficient evidence of facts to make out a prima facie cause of action, such that there is no issue to be decided by the fact-finder. If there is evidence that would allow a fact-finder to render a verdict in favor of the non-moving party, then summary judgment should be denied.

*Jones v. Levin,* 940 A.2d 451, 452–454 (Pa.Super.2007) (internal citations omitted).

There are few cases relating to beryllium exposure applying Pennsylvania law. Pennsylvania does have extensive case law dealing with injuries caused by exposure to asbestos, which are instructive in resolving the instant appeal. In *Simmons v. Pacor, Inc.,* 543 Pa. 664, 674 A.2d 232 (1996), the plaintiffs had pleural thickening caused by exposure to asbestos. However, they suffered no lung impairment, and the Pennsylvania Supreme Court held that asymptomatic pleural thickening was not a compensable injury because the injury was not accompanied by "physical injury or physical impact." 674 A.2d at 237–238; *see also Giffear v. Johns–Manville Corp.,* 429 Pa.Super. 327, 632 A.2d 880 (1993). In *Cauthorn v. Owens Corning Fiberglas Corp.,* 840 A.2d 1028 (Pa.Super.2004), this Court was called on to determine "[w]hat constitutes a compensable asbestos-related injury." Id. at 1035. The Court stated that while no recovery was possible for asymptomatic injuries, "[i]f the plaintiff can prove that his asbestos-related disease has led to 'discernible physical symptoms or functional impairment,' plaintiff has proven that his asbestos-related disease is 'symptomatic' and thus compensable." *Id.*

In *Taylor v. Owens–Corning Fiberglas Corp.,* 446 Pa.Super. 174, 666 A.2d 681 (1995), this Court held that diagnosis of an asbestos-related disease even when accompanied by shortness of breath is an asymptomatic disease. The Court reasoned that "[i]t is common knowledge that breathlessness is also associated with any number of non-asbestos-related ailments including lung cancer, excessive cigarette smoking, heart disease, obesity, asthma, emphysema, and allergic reactions." *Id.* at 687, n. 2. However, in *White v. Owens–Corning Fiberglas Corp.,* 447 Pa.Super. 5, 668 A.2d 136 (1995), this Court reversed a grant of summary judgment based on a statute of limitations claim, finding that the plaintiff's "shortness of breath did not constitute a discernible physical symptom of an asbestos-related disease until at least 1987 when he was diagnosed with asbestosis and be-

gan to have difficulties walking more than half a block, climbing a flight of stairs, or washing dishes." *Id.* at 146. Discussing the *Taylor* and *White* holdings, this Court stated:

> Thus, it was the testimony [in *White* ] showing plaintiff's shortness of breath hampered his daily life activities (along with evidence demonstrating a causal connection between his shortness of breath, asbestos exposure, and asbestos-related lung injuries) which enabled plaintiff to satisfy his burden of production and established a *prima facie* case of symptomatic (and therefore compensable) asbestos-related injuries.

*Cauthorn,* 840 A.2d at 1036.

In *McCauley v. Owens–Corning Fiberglas Corp.,* 715 A.2d 1125 (Pa.Super.1998), this Court agreed that shortness of breath alone was not a compensable injury. *Id.* at 1131. However, the Court reversed the trial court's grant of a compulsory nonsuit, finding that the plaintiff presented a *prima facie* case where he introduced evidence of an asbestos-related disease, shortness of breath, and a causal connection between the two. *Id.; see also Cauthorn,* 840 A.2d at 1036 (discussing the *McCauley* case). Similarly, in *Ryan v. Asbestos Corp., Ltd.,* 829 A.2d 686, 689 (Pa.Super.2003), this Court stated: "Shortness of breath, without any evidence that shortness was caused by asbestosis, is not a compensable injury.... Where the symptom of shortness of breath is causally related to a diagnosis of asbestos, a compensable injury does in fact exist." *See also Lonasco v. A–Best Products Co.,* 757 A.2d 367, 374 (Pa.Super.2000).

██ Drawing from the analogous asbestos-exposure cases, to establish a *prima facie* case of a compensable injury in the context of beryllium exposure, a plaintiff must demonstrate (1) diagnosis of a beryllium-related disease; (2) a physical impairment; and (3) a causal connection between the disease and the symptom. Shortness of breath can constitute a physical impairment sufficient to establish a *prima facie* case where the plaintiff satisfies the additional two criteria. We did not include the *White* requirement of demonstrating that shortness of breath has hampered life activities. The later case law does not discuss this requirement. Additionally, a person suffering from shortness of breath is very likely to experience an impact on normal life activities.

██ A plaintiff does not have to eliminate every other possible cause to recover. The trial court relied on *Quate v. American Standard, Inc.,* 818 A.2d 510 (Pa.Super.2003), for the proposition that

> because plaintiff "suffer[ed] from several medical conditions that could account for his breathlessness," making it "impossible to causally relate Quate's shortness of breath to any particular medical condition that [sic] or to any physical restriction that he experiences." Relying on *Simmons* and its progeny, the *Quate* Court held that where a plaintiff suffers from a non-asbestos-related ailment that is commonly associated with shortness of breath, there is no compensable injury without additional symptoms that tie the shortness of breath to the asbestos-caused lung disease.

Trial Court Opinion, 7/21/2009, at 6. However, *Quate* was overruled in *Summers v. Certainteed Corp.,* 997 A.2d 1152 (Pa.2010), wherein the Pennsylvania Supreme Court held that "where it is clear that reasonable minds could differ on the issue of causation, precluding asbestos litigants from pursuing causes of action, supported by competent medical evidence, merely because of the existence of competing health conditions, is unsustainable." *Id.* at 1163. The court stated that "[t]he resolution of

any conflict between competent, competing medical evidence, under clear precedent, must be left for a jury." *Id.* at 1165. Thus, under *Summers*, simply because a plaintiff suffers from multiple ailments that may cause shortness of breath is not a sufficient reason to grant summary judgment where there is competent evidence that the asbestos-related disease is the cause of the impairment.

We now turn to the facts of the instant matter. On August 15, 2000, Leonard Harris was evaluated by Dr. Milton D. Rossman, a pulmonologist. Harris reported having a cough and phlegm for the previous twenty-three years and a diagnosis of asthma approximately six years prior. He complained of shortness of breath, causing him trouble while dressing and trying to leave the house. At the time of the examination, Harris had "decreased respiratory sounds throughout significantly [sic] in his lower lobes." Letter from Dr. Rossman, 9/26/2000, at unnumbered page 2. Further, "[h]is chest x-ray showed probably chronic obstructive lung disease with cardiac and mediastinal silhouettes being normal. The lung fields were clear and there was no evidence of interstitial lung disease." *Id.* Pulmonary function tests showed a slightly reduced diffusing capacity; normal lung capacity; an elevated residual volume; a reduced vital capacity indicative of air trapping; and a severe reduction of maximum voluntary ventilation. There was also evidence of a single granuloma. Dr. Rossman concluded that despite sensitization to beryllium and a history of exposure, "there is no definite evidence that chronic beryllium disease is the cause of his symptoms." *Id.* at unnumbered page 3.

Dr. Rossman again examined Harris on December 3, 2002. In his report, he detailed Harris' other medical conditions and medications. During his examination, Dr. Rossman found that Harris "had some rales in your left lower lobe but otherwise your lungs had clear respiratory sounds." Letter from Dr. Rossman, 12/3/2002, at unnumbered page 2. Harris' pulmonary function tests showed his vital capacity and diffusing capacity had declined. Dr. Rossman found that these results were "consistent with airway obstruction of a moderate degree with significant air trapping and diffusion defect." *Id.* Harris' chest x-ray was the same as at the August 2000 visit, "however [his] high-resolution CAT scan revealed multiple calcified granuloma in the mediastinum and in the lung, consistent with old beryllium disease or old granulomatous disease." *Id.* Dr. Rossman concluded:

> In summary, Mr. Harris, you would meet the Department of Labor's classification for beryllium disease based on their criteria for compensation. This would include abnormal PFTs, an abnormal CAT scan, and evidence of a lymphocytic process in your lungs based on the granuloma on the biopsy and the increased BAL lymphocytosis. In addition, you have had repeatedly positive blood proliferative responses to beryllium on at least three occasions. I am concerned that there may be some progression of your disease with you declining DLCO. Currently, you do not appear to be limited from a pulmonary aspect and I do not think at this point in time there is need to initiate therapy. However, I would strongly recommend that you return in 1 year for a repeat evaluation. At that time, we will also get a 6–minute walk test to be sure that there is no desaturation with activity.

*Id.* Harris died on February 24, 2003, before he could return for any additional evaluations.

After Harris' death, Dr. Craig Glazer, an assistant professor and physician who is

1066

board certified in the areas of occupational/environmental medicine and pulmonary medicine, reviewed Harris' medical records, including physicians' reports, discharge summaries, and test results. Dr. Glazer reported that Harris first experienced shortness of breath in 1991. Tests revealed a steep fall in his total lung capacity over the next three years. In the late 1990s, Harris was diagnosed with chronic obstructive pulmonary disorder. Dr. Glazer believed both this and Harris' earlier asthma diagnosis to be incorrect. Harris was confirmed positive for beryllium sensitization and was referred to Dr. Rossman in 2000. Dr. Glazer stated that subsequent testing revealed "lung pathology consistent with chronic beryllium disease," especially considering Harris' opportunities for exposure working at the Reading plant and living within the vicinity of the plant for an extended period of time. Expert Witness Report by Craig S. Glazer, M.D., M.S.P.H., F.C.C.P., at unnumbered page 8. This includes abnormal pulmonary function tests, abnormal radiologic findings on a CT scan, and chronic respiratory disorder, all factors consistent with CBD. Glazer concluded:

It is also my medical opinion that Mr. Harris' chronic respiratory symptoms and abnormal function over the decade prior to his death had a significant negative impact on his quality of life and were secondary to his CBD. This abnormal pulmonary function undoubtedly contributed to his respiratory failure and death. Unfortunately, no ongoing monitoring from the plant had been performed so the discovery of Mr. Harris' CBD was much delayed. An earlier diagnosis might have allowed more appropriate follow-up and initiation of treatment which could have improved Mr. Harris' quality of life.

*Id.* at unnumbered page 9.

In reviewing the evidence presented, the trial court found that Dr. Glazer's report was "not competent as his findings that Mr. Harris's shortness of breath is caused by his CBD is not based on any facts or data which would establish such." Trial Court Opinion, 7/23/2009 at 7. The trial court stated that Dr. Glazer's report "does not provide any facts or explain how he arrived at the conclusion that Mr. Harris's shortness of breath was caused by his CBD." *Id.* The trial court also stated that Dr. Glazer's report was deficient in that it "does not explain how he was able to rule out Mr. Harris's other medical conditions as a possible cause of his shortness of breath." *Id.* Based on these findings, the trial court concluded that Appellants were unable to establish a *prima facie* case that CBD caused Harris' shortness of breath. *Id.*

■■■ We disagree with the trial court's conclusion. As discussed earlier, the trial court's assertion that Appellant must rule out all other possible causes of his shortness of breath is incorrect. *See Summers,* 997 A.2d at 1163; discussion *supra* at 9. Further, we find that Dr. Glazer's report is competent. All facts and reasonable inferences therefrom must be evaluated in a light most favorable to the non-moving party at the summary judgment stage. *Summers,* 997 A.2d at 1161.

This clearly includes all expert testimony and reports submitted by the non-moving party or provided during discovery; and, so long as the conclusions contained within those reports are sufficiently supported, the trial judge cannot *sua sponte* assail them in an order and opinion granting summary judgment. Contrarily, the trial judge must defer to those conclusions, and should those conclusions be disputed, resolution of that dispute must be left to the trier of fact.

*Id.; see also Gutteridge v. A.P. Green Services, Inc.,* 804 A.2d 643, 659 (Pa.Su-

per.2002), *petition for allowance of appeal denied,* 574 Pa. 748, 829 A.2d 1158 (2003) ("While [defendant] may dispute the conclusions reached by Appellant's experts, credibility and the weight to be assigned to evidence are not proper considerations at the summary judgment stage of proceedings."); *Rauch v. Mike–Mayer,* 783 A.2d 815, 821 (Pa.Super.2001), *petition for allowance of appeal denied,* 568 Pa. 634, 793 A.2d 909 (2002) ("it is for the jury to determine the weight to be given to expert testimony in light of the qualifications presented by the witness").

Summary judgment may be granted only "where the right to such judgment is *clear and free from all doubt." Summers,* 997 A.2d at 1159, *quoting Toy v. Metropolitan Life Ins. Co.,* 593 Pa. 20, 928 A.2d 186, 195 (2007) (emphasis added). Further, a "less stringent" level of proof is "required to allow a question to evade summary disposition." *Watkins v. Hosp. of the Univ. of Pa.,* 737 A.2d 263, 268 (Pa.Super.1999). "The quantum of evidentiary facts which must be adduced to preclude summary judgment is not the same as that required at trial." *Id.*

■ Appellant produced sufficient evidence to preclude a grant of summary judgment. Harris was diagnosed with CBD prior to his death, as evidenced by multiple tests. *See* Dr. Rossman's letters, discussed *supra.* Dr. Glazer clearly concluded that CBD was a factor in causing Harris' death. Further, despite the trial court's allegation that Dr. Glazer did "not

provide any facts or explain how · he arrived at" his conclusion, Dr. Glazer did explain the materials he reviewed during his evaluation and stated that he based his opinion on those materials as well as his "knowledge of [CBD] gained from extensive training in beryllium related health effects and from my knowledge of the medical literature in this area," as well as his "experience evaluating patients with beryllium exposure and caring for individuals with beryllium related health effects including beryllium sensitivity and chronic beryllium disease." Expert Witness Report by Craig S. Glazer, M.D., M.S.P.H., F.C.C.P., at unnumbered page 9.

In their brief, Appellants point to various test results, which Dr. Glazer reviewed prior to issuing his report, which would support his conclusion that CBD was a contributing factor in Harris' death. This data includes Harris' decreased lung capacity; two abnormal beryllium lymphocyte proliferation tests; the existence of granulomas in Harris' lungs; worsening pulmonary function test results; and bilateral pulmonary nodules and areas of scarring. Brief for the Appellants, at 16; *see also* Reply Brief for the Appellants, at 3. These facts, combined with Harris' diagnosis of CBD and Dr. Glazer's conclusion, made to a reasonable degree of medical certainty, are sufficient to preclude summary judgment.[13]

The September 29, 2008 order relating to the Estate's claims and Mrs. Harris' loss of consortium claim is reversed.[14]

---

13. *Checchio v. Frankford Hosp.,* 717 A.2d 1058 (Pa.Super.1998), *petition for allowance of appeal denied,* 566 Pa. 633, 781 A.2d 137 (2001), is distinguishable from the instant case because *Checchio* dealt with an asserted causal connection between perinatal hypoxia and autism and/or pervasive developmental disorders, a relationship not supported by "any documented scientific authority." In the instant case, shortness of breath is a gen-

erally recognized symptom of chronic beryllium disease. *See* U.S. Dep't of Labor, Occupational Safety & Health Admin., *Beryllium and Chronic Beryllium Disease,* http://www.osha.gov/SLTC/beryllium/be_and_chronic_be_disease.html.

14. The trial court also dismissed Mrs. Harris' loss of consortium claim because it is a derivative claim, based on the success of the un-

The order dated September 29, 2008, relating to claim the against SSM is affirmed. The order dated January 18, 2008, regarding Mrs. Harris' medical monitoring claim is affirmed. The matter is remanded for proceedings consistent with this Memorandum. Jurisdiction relinquished.

derlying claim of the spouse. Because we are reversing the trial court's determination regarding the underlying claim, the dismissal of Mrs. Harris' loss of consortium claim must likewise be reversed. *See, e.g., Cominsky v. Donovan*, 846 A.2d 1256, 1260 (Pa.Super.2004) (vacating a damages award and remanding a derivative loss of consortium claim where there was an evidentiary error at trial requiring a new hearing on damages in the underlying claim).